UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**          :
                                       :  Docket No. CR 05-100
        **Plaintiff,**                 :
                                       :
        **v.**                         :
                                       :  Washington, DC
**GREGORY BELL,**                      :
                                       :  May 8, 2008
        **Defendant.**                 :  2:30 p.m.
                                       :
                                       :

*TRANSCRIPT OF SENTENCING PROCEEDINGS*
*BEFORE THE HONORABLE RICHARD W. ROBERTS*
*UNITED STATES DISTRICT COURT JUDGE, and a JURY*

APPEARANCES:

  For the United States:       UNITED STATES ATTORNEY'S OFFICE
                               Glenn S. Leon, Assistant United
                               States Attorney
                               Ann H. Petalas, Assistant United
                               States Attorney,
                               555 4th Street
                               Washington, DC  20001
                               202.305.0174


  For Defendant               LAW OFFICE OF JAMES W. BEANE
  Gregory Bell:               James W. Beane, Jr., Esq.
                               2715 M Street, N.W.
                               Suite 200
                               Washington, DC  20007
                               202.333.5905


  Court Reporter:             Scott L. Wallace, RDR, CRR
                               Official Court Reporter
                               Room 6814, U.S. Courthouse
                               Washington, DC 20001
                               202.326.0566


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**AFTERNOON SESSION, MAY 8, 2008**

(2:36 p.m.)

THE COURTROOM CLERK:  This is Criminal Case 05-100, the United States versus Gregory Bell.  Representing the government is Glenn Leon, Ann Petalas.  Representing the defendant is James Beane.  Probation officer, Michael Penders.  This is a sentencing.

THE COURT:  Good afternoon.  Let me make sure counsel had a chance to look at the letter that I left out for you to examine.  Both sides have?  All right.

Mr. Beane, have you and your client read and discussed the presentence report?

MR. BEANE:  Yes, we have.

THE COURT:  Let me hear from you, then, on any comments that you have to make about it or any objections that I need to resolve to the report.

MR. BEANE:  If I may, Your Honor.

The objections that we have to report are listed in the back of the final report, but I will go down that list just briefly.

The first objection that we lodged was that we objected to the breadth and the scope of the actual activity that the presentence report was ascribing to Mr. Bell, and I think that's something that the Court will resolve during the actual sentencing, if I'm not mistaken.

1          We then next challenged the testimony of individual

2     witnesses that we believed the government was relying on to

3     substantiate its claim that Mr. Bell should be subjected to a

4     much higher guideline range based on either the acquitted conduct

5     or what we call relevant conduct.

6          I think that I would prefer to go down this list when I'm

7     actually arguing the sentence as opposed to just pointing out the

8     objections.

9          THE COURT:  Say that again.

10         MR. BEANE:  I said I think I would prefer to go through

11     this during my argument to the Court regarding sentencing

12     identifying each witness that we challenge, unless the Court

13     wants me to challenge them now, which I can do.  It's up to the

14     Court.

15         THE COURT:  What I want you to do is to tell me about any

16     challenges I need to resolve.  I'm going to resolve challenges to

17     any parts of the presentence report first so we'll know what

18     remains, and after that, then I'll be happy to have you allocute

19     once you know what challenges have and have not been resolved

20     favorably or unfavorably.

21         MR. BEANE:  Okay.  Well, with that in mind, Your Honor, we

22     are going to challenge the credibility of the testimony of Gail

23     Parson, Ms. Proctor, Bobby Capies, Kairi Kellibrew, Cedric

24     Conner, and I think it's Robert Pogue, I believe is the way his

25     name is pronounced.

1          I think that's the extent that the government's going to

2     rely on witnesses.  But if not, we would reserve the right to

3     challenge them as they come up.

4          I guess the more substantive challenge goes to the

5     obstruction of justice, the obstruction of justice enhancement,

6     based on, I believe, the testimony of Charlette O'Brien, Brittany

7     O'Brien and Donna Brown.

8          We specifically challenge this based on the fact that

9     Brittany O'Brien and a Charlette O'Brien both indicated during

10    the proceedings that neither of them felt threatened by Mr. Bell

11    at any point.

12         Specifically, Mr. Bell went to the O'Briens' residence,

13    but the O'Briens were not at that time -- did not at that time

14    feel threatened.

15         It wasn't until Mr. Bell and the gentleman in the gray

16    hoody left the residence that the O'Briens got a phone call.  And

17    after Ms. Charlette O'Brien got the phone call, she decided to

18    pack up her family, and that's because the substance of the phone

19    call had to do with whether or not Brittany O'Brien chose to

20    cooperate in the officer's investigation of that particular

21    murder.

22         The language that the caller used was at times, I think,

23    in question during the trial, but ultimately it came out through,

24    I believe, Ms. Charlette O'Brien that the caller said

25    specifically, "tell your daughter to cooperate with the police,"

1   not "fail to cooperate;" in other words, not to obstruct justice.

2   She was not advised to obstruct justice.  She was advised to

3   cooperate.

4        So, based on that, we don't believe that the O'Briens

5   support the claim that Mr. Bell in any way obstructed justice.

6        The second portion to that is Ms. Browne alleged during

7   the trial that Mr. Bell and other of the co-defendants taunted

8   her, and at some point someone threatened to kill her; but, in

9   the context of her testimony when it's read altogether, she never

10  indicates that the threats were in any way connected to her

11  reporting on or failing to report on criminal activity that she

12  saw.

13       So, at best, Ms. Browne's testimony establishes a charge

14  of threats, felony threats, even, but not obstruction of justice

15  under the guidelines, and so we're objecting to that particular

16  enhancement.

17       We made an objection with regards to acceptance of

18  responsibility, basically because Mr. Bell did negotiate for a

19  plea during the entire trial, and he wanted -- I think he

20  expressed a desire to take a plea but not to the conspiracy,

21  which he believes he was not a part of.

22       The problem with that is not giving him the acceptance of

23  responsibility when he was willing to accept responsibility for

24  the distribution, the three distributions that he was found

25  guilty of, the problem is that we start to punish people who

1    don't want to lie to the Court.

2         In other words, Mr. Bell did not want to come before the

3    Court and say "I'm guilty of conspiracy."  That would be a lie to

4    the Court.  He was willing to come to the Court and tell the

5    truth, that "I'm guilty of the distribution."

6         It seems -- it's unseemly to some of us that he would be

7    denied the ability to accept responsibility because it was up to

8    the government to decide whether or not he could plead guilty to

9    individual counts, and they never permitted us to do that.

10        So -- and I don't think, at least in the past I've been

11   told by the courts that it's not up to the Court whether or not

12   Mr. Bell can plead to individual counts, it's up to the

13   government whether they're willing to let him plead to individual

14   counts and move on.

15        THE COURT:  That's certainly true with respect to the

16   ability to have a plea agreement with the government.

17        That is the case with respect to whether he can plead

18   guilty pursuant to a government plea agreement.

19        MR. BEANE:  Okay.

20        THE COURT:  But that is -- that adds in whether he can do

21   it pursuant to the government's plea agreement.  It has nothing

22   to do with whether he can do that absent a government plea

23   agreement.

24        MR. BEANE:  I think I understand.

25        The other prong to that, as I think as the Court recalls,

 1    is that in our opening statement I, on behalf of Mr. Bell, in

 2    fact, accepted responsibility for distribution of drugs.

 3         In my opening statement I specifically said that Mr. Bell

 4    and others did distribute drugs, so we did acknowledge that that

 5    had happened, but I countered that immediately by saying he was

 6    not involved in a conspiracy or the RICO.  So that's another

 7    objection.

 8         THE COURT:  Your closing changed tactics, however.

 9         MR. BEANE:  I accept that.  I really don't recall, but I

10    accept the Court.

11         The only other objection we have that I think the

12    presentence report writer addressed was that Mr. Bell's prior

13    conviction was actually for -- was actually for a crime that was

14    committed over 17 years ago, I believe, and that he was sentenced

15    under the Youth Act.  But I think that that, too, goes to the

16    allocution more than the objection at this point, although he did

17    lodge the objection.

18         Those are the objections we have to the presentence

19    report.

20         THE COURT:  You had made an objection to the weapons

21    enhancement.  Is that still outstanding?

22         MR. BEANE:  Yes, that is.  I apologize, Your Honor.  I

23    missed that.

24         Our objection to the weapons enhancement is essentially

25    that during the trial itself Mr. Bell's -- I believe the gun that

1    the -- that's now being listed as justification for the weapons

2    enhancement is the firearm that was recovered in Mr. Bell's --

3    Mr. Raymond Bell's apartment back in 1996.

4         Our objection to that is that Mr. Raymond Bell immediately

5    accepted responsibility for possessing that firearm and, in fact,

6    came before this Court and again accepted responsibility for that

7    firearm.  So there is no basis to enhance Mr. Bell's sentence for

8    being in possession of a firearm in 1996.

9         I think -- unless -- well, at one point I think the

10   government was relying on the allegations that Mr. Bell was in

11   some way involved in a robbery a number of years ago, that it's

12   probably outside the time of the conspiracy, although I can't say

13   that for certain.

14        But again, that testimony was, one, unsubstantiated in any

15   way.  It was given by a person who stood to benefit a great deal.

16   Our argument is that the testimony was simply unreliable.  And so

17   that's our objections to the enhancement under the weapons.

18        THE COURT:  All right.  Anything else?

19        MR. BEANE:  No.  I think that covers it, but we would

20   reserve the opportunity to object later if something comes up

21   related to them.

22        THE COURT:  Mr. Leon, do you have any comments about the

23   presentence report and any responses to the objections lodged?

24        MR. LEON:  Thank you, Your Honor.  Good afternoon.

25        THE COURT:  Good afternoon.

```
1          MR. LEON:  We do.  We do not have any objections to the
2    presence report.  We do have comments with respect to
3    Mr. Gregory Bell's objections to the presentence report.  I'll
4    try to take them in order.
5          First, we do think the PSR correctly relied upon, and we
6    would respectfully submit that the Court would be more than
7    reasonable to rely upon, the credibility of various witnesses who
8    testified in this case.
9          The government -- and we did outline various government
10   witnesses.  Mr. Beane ticked off many of them, I don't think all
11   of them, but we did outline them in our sentencing memorandum.
12         As the Supreme Court case of Gall indicates, and we cite
13   this on page 7 of our memorandum, the sentencing judge sees and
14   hears evidence, makes credibility determinations, and has full
15   knowledge of the facts and gains insights not conveyed by the
16   record.
17         Indeed, the Court sat through a lengthy trial and heard
18   various witnesses take oaths, and we think that it would be well
19   within the Court's discretion under the rules, under the law,
20   under the sentencing guidelines, to make credibility findings to
21   support, in this case at least, taking off the first of the
22   objections, certainly the drug amount.
23         A small footnote to the drug amount.  We did not lodge an
24   objection to this, although, frankly, I considered it, and this,
25   perhaps, ties into my allocution in a few moments.
```

1        Of all the defendants, the one by far who I think the

2   government would have had a very fair argument to make would have

3   been, for a 4.5-kilogram argument, would have been Mr. Gregory

4   Bell.  We didn't make that here.  We stated 1.5 kilograms.

5        But the overwhelming evidence in this case was that

6   Mr. Bell was the most prolific drug dealer for the length of the

7   conspiracy.  And even over the rough numbers that the government

8   laid out, I think if you add up all those numbers that we laid

9   out, I think you're right at 4.5.  And, again, they were

10  conservative numbers.

11       So we didn't make the objection formally, but I would at

12  least note that 1.5 was a very, very conservative number that the

13  presentence writer used.  And we were using conservative numbers

14  and we came right up to 1 point -- excuse me -- 4.5 kilograms,

15  and we think it would certainly not be in any way an abuse of

16  this Court's discretion to make a finding that Mr. Bell is

17  responsible for 4.5 kilograms of crack cocaine.

18       We also -- and we submitted a memorandum yesterday, a

19  reply memorandum, where we do address -- I'm not sure if the

20  Court -- if the Court doesn't have it, I do have an extra copy.

21  We --

22       THE COURT:  I'm only looking because you said yesterday.

23  I'm not sure if what I saw was yesterday or the day before.

24       MR. LEON:  I might -- it might have been two days ago,

25  Your Honor.

1       THE COURT:  I got it.  All right.

2       MR. LEON:  We made a few points there, but one does relate

3   to Mr. Beane's objections with respect to the gun bump.  I think

4   I'm moving around now.  Let me get to that in a minute.  Let me

5   stay in order.  I apologize.

6       With respect to the obstruction, Your Honor, I think

7   Mr. Beane remembers the record incorrectly, with respect.  We did

8   lay out the relevant excerpts in our sentencing memorandum about

9   the exact testimony of Charlette O'Brien.

10      She testified that Mr. Gregory Bell, literally hours after

11  this murder happens, which she and her daughter were at least

12  direct -- witnesses to, he comes to her home in the very early

13  morning with a man with a hood over his head.

14      Mr. Gregory Bell never ever, ever came to her home, ever.

15  But on this early morning, hours after the murder, Mr. Bell comes

16  looking for Brittany, and she said she was scared, and she said

17  she was afraid, and she said that she packed her bags and they

18  left that night and they never came home to that house.  Her fear

19  is actually beside the point.

20      As the commentary correctly notes of the guidelines,

21  Section 3C1.1, commentary paragraph 4, sub A, uses the following

22  language as correctly noted by the presentence writer.

23      An example is "threatening, intimidating, or otherwise

24  unlawfully influencing a," in this case, "witness, directly or

25  indirectly, or attempting to do so."

1          Fear is not an element, it's not a requirement.  It's what

2     the person is trying to do.  And we think certainly on that

3     record, the sworn testimony of Ms. Charlette O'Brien, a very fair

4     inference is that Mr. Gregory Bell intended to influence or

5     attempted, at least, to influence the testimony of an eyewitness

6     to a murder committed by one of his co-defendants, two of his

7     co-defendants.

8          And then the final issue I do take with Mr. Beane on that.

9     My memory -- Mr. Beane, I think, is correct that there was a bit

10    of a dispute as to how Ms. O'Brien characterized the phone call

11    she received shortly after the visit from Mr. Bell and his hooded

12    friend, but my memory of the testimony was that she was impeached

13    with an audiotape of her grand jury testimony where the audiotape

14    seemed to hear her say the person said "to snitch."

15         So Mr. Beane is correct that the impeachment involved the

16    language "to snitch," but Ms. O'Brien's testimony from that

17    witness stand under oath, under repeated cross-examination, was

18    "I was told not to snitch."

19         So there was impeachment, but upon cross-examination

20    repeatedly in this courtroom, she said "not to snitch," and

21    that's what she was told by that caller.

22         It's beside the point because that caller -- we did not

23    link that caller up to Mr. Bell, but I do make it because I

24    think, in fairness, the record should be clear.

25         With respect to the acceptance of responsibility, I think

1    the law is clear on this.  The Court is quite right.  Mr. Gregory

2    Bell could have walked in at any point to this Court without any

3    plea agreement and said, Well, no, I didn't do this conspiracy,

4    but sure, that's me on these tapes."  And he didn't do that.  He

5    certainly didn't do that with respect to the other counts.  There

6    were a few counts where he was acquitted upon of stand-alone drug

7    counts, and he certainly didn't do that there.

8         So, for Mr. Beane to walk in and say that there should be

9    a half credit for that is not based on any law and certainly not

10   based on any common sense.

11        And I will just say, to clear up the record here, there

12   were general discussions of a plea among several defendants and

13   the government.  Those pleas were always general in nature, they

14   always involved the possibility of a global, wired plea among all

15   or a significant portion of the six remaining defendants.

16        But for Mr. Beane to make a representation that -- I don't

17   want to get personal with Mr. Beane.  That's not my point.  But I

18   will just say that at no point were these plea discussions at any

19   point where the government sat across the table with Mr. Gregory

20   Bell and he debriefed and he admitted anything.  These were

21   general conversations that happened in virtually every case in

22   this country where a responsible defense attorney makes overtures

23   to the prosecutor prior to trial.

24        And lastly, with respect to the gun bump, we think it's

25   certainly appropriate.  We think that for the reasons stated in

1    our reply memorandum, they're appropriate.

2         A biased witness, such as Mr. Bell's father for the

3    reasons stated, Mr. Raymond Bell, Sr., lays out a factual proffer

4    that this Court can certainly consider that Mr. Bell, at minimum,

5    possessed separate piece of ammunition in his home, in his

6    private room with the scale and the drugs and with everything

7    else, and that my memory of the testimony is that single piece of

8    ammunition was not necessarily linked to the loaded gun in the

9    home.  So, at minimum, that is suggestive of another weapon that

10   Mr. Gregory Bell had.

11        And, again -- and, in any event, all Mr. Raymond Bell, Sr.

12   said was, "I was cleaning up after a party.  I found a gun, it

13   wasn't mine, and I put it in the kitchen cabinet, and then I put

14   it in my son's closet."

15        He didn't say it was his, and he didn't say it wasn't his

16   son's, he just said, "It wasn't mine and I found it," and lo and

17   behold, it ends up in his son's bedroom the morning of the search

18   warrant the next day.

19        In any event, we outline several other reasons why it

20   would be appropriate to attribute a two point gun enhancement for

21   possession of a dangerous weapon.  We outline that on pages 18,

22   19, and 20 of our sentencing memorandum.

23        In addition, Mr. Bell's entrenchment in this conspiracy,

24   we think, and his conspiratorial arrangement and agreement with

25   other members of the conspiracy, certainly under *United States vs*

1  *Tavron*, 437 F.3d 63, D.C. Circuit case from 2006, certainly his

2  agreement and arrangement with his armed co-conspirators

3  certainly warrants a gun enhancement.

4       And I would also just refer to the testimony of Kairi

5  Kellibrew.  I'm sure both counsel will discuss Mr. Kellibrew

6  shortly.  But we certainly submit that the Court -- or

7  respectfully suggest that the Court credit the testimony of Kairi

8  Kellibrew for various reasons.  On page 14 of our sentencing

9  memorandum, we cite Mr. Kellibrew's testimony, and I'll just read

10  it very briefly.

11       He testified that in the mid-'90s during the conspiracy

12  when Mr. Kellibrew was in his early teens -- 12, 13, 14 years

13  old -- he spent time with his older cousin Antwuan Ball and his

14  good friend Gregory Bell.

15       It's worth noting here that Gregory Bell is a 37 -- might

16  be 38 at this point -- 37, 38-year-old man, very close in age to

17  Antwuan Ball; I believe a year older than Antwuan Ball.

18       Kairi Kellibrew is about ten years younger than these men,

19  so young man, Kairi Kellibrew, coming up in the ranks learning

20  from his older cousin Antwuan Ball and his good friend Gregory

21  Bell.

22       Mr. Kairi Kellibrew testified that around 1994 or so, he

23  saw Mr. Ball selling and cutting up crack cocaine in the family's

24  house.  In addition, they, quote, "they always had guns," closed

25  quote, in the house, and that is in conjunction with other

1    testimony that I won't recite, but in the following paragraph

2    about how Boy-Boy, Joseph Jones, and Antwuan Ball were part of

3    that core group in Mom's house and in Antwuan's home in the

4    mid-1990s.  So there's ample evidence in this record, we

5    respectfully submit, to give Mr. Bell a two-point enhancement as

6    well.

7         I think I've addressed all of the -- the other final thing

8    with respect to the criminal history.  My understanding is that

9    Mr. Bell has a criminal history of one, so while it's important,

10   perhaps, to make a ruling upon, I don't think it affects the

11   calculations for guidelines purposes.

12        But we do think on page 27 of the presentence report, the

13   presentence report writer, Mr. Penders, was correct and correctly

14   cited the guidelines at 4A1.2(e)(2) that counting that conviction

15   was appropriate.

16        I have nothing further, unless the Court has any

17   questions.

18        THE COURT:  All right.  Thank you.

19        Let me take up the objections.  The first objection was

20   the relevant conduct objection.

21        The defendant was convicted of only three counts of

22   distributing crack with each sale amounting to a weight of less

23   than five grams.  However, the presentence report holds the

24   defendant accountable for over 1.5 kilograms of crack that was

25   involved in the narcotics conspiracy activity that the defendant

1   was charged with but acquitted of.  This is the activity that Joe

2   Langley and seven other co-defendants admitted to in guilty pleas

3   and which Newett Ford was convicted of by a jury.

4        This additional volume of crack can be attributed to the

5   defendant in only two ways:  If reliable information shows by a

6   preponderance of the evidence that either, one, the defendant

7   joined in that conspiracy, that the scope of what defendant

8   agreed to included cooperating and distributing crack, and that a

9   volume of crack sales among all conspirators exceeding 1.5 kilos

10  was foreseeable to the defendant; or, two, if the defendant's

11  uncharged crack transactions that were a part of the same scheme

12  or plan as the offense of conviction added totaled 1.5 kilos or

13  more.  The evidence presented of the defendant's knowing

14  membership in a crack distribution conspiracy foreseeably

15  involving at least 1.5 kilograms and actually handled by the

16  defendant was direct and circumstantial.

17       The defendant knew many of the charged conspirators and

18  associated with them in Congress Park.  That was established by

19  the countless witnesses at trial who saw them together during the

20  charged period and whose accounts as to that detail were largely

21  undisputed and the countless photographs showing the defendant

22  and the others together in Congress Park venues and other

23  locations.

24       Also witnesses testified that they saw the defendant and

25  charged co-conspirators selling crack in Congress Park during the

1    period charged.  Among them were witnesses mentioned in the

2    government's memorandum:  Bobby Capies, Keith Barnett, Kairi

3    Kellibrew, Jack Powell, Gail Parson, and Marilyn Proctor.

4        Also, some witnesses said they saw the defendant obtain

5    supplies of crack for resale, including Capies and Cedric Conner.

6        Also, witnesses such as Capies, Barnett, and Powell

7    testified how the charged conspirators cooperated with each other

8    in selling crack in Congress Park during the charged period by

9    participating in the *unos, dose, tres* method of sharing of sales

10   proceeds.

11       Capies saw the defendant participate.  Conner, a

12   comparative outsider, added how Desmond Thurston and Daniel

13   Collins told Conner that Conner could not sell at those same

14   locations in Congress Park that they had built up, and how

15   Antwuan Ball reinforced that message by saying that his group

16   made its livelihood selling there.

17       The government's memo sets forth reliable evidence from

18   the testimony of Conner, Capies, Gail Parson, Marilyn Proctor,

19   Powell and Kellibrew, from which a calculation even more

20   conservative than that outlined in the memo by the government can

21   be undertaken reflecting the defendant's personal involvement in

22   the purchase and sale of over 1.5 kilograms of crack.

23       Conner alone established supplying an estimated quantity

24   in excess of one kilo between 1999 and 2000, and Capies alone

25   established buying over 500 grams from 1992 to 2001 at a rate

that would not risk double counting Conner's one- to two-year

supply; namely roughly four grams every now and then.

   The remaining witnesses push the estimated amount safely

above an additional 100 grams.  Given the length of time over

which the witnesses saw the defendant obtaining and selling

crack:  Capies said from as early as a period from 1992 to 1996

to as late as a period from 1996 to 2001; Proctor saying as late

as a period of 2003 to 2005; with Barnett, Kellibrew, Conner, and

Powell testifying to periods in-between; and the frequency with

which the witnesses said the defendant was selling, such as

Barnett seeing the defendant all day for years between 1993 and

2003, the estimate of at least 1.5 kilos is reasonable.

   As to these details I credit the testimony of those

witnesses and I find by clear and convincing evidence:

   One, that a conspiracy to distribute crack in the Congress

Park area existed among the defendants and others, including the

eight others convicted of conspiracy by guilty plea or after a

trial, and Antwuan Ball, David Wilson, Desmond Thurston, Joseph

Jones, and Dominic Samuels;

   Two, that the scope of what the defendant agreed to

included buying supplies of crack and selling it or helping

others to resell it in Congress Park;

   Three, that a volume of crack sales among all conspirators

exceeded 1.5 kilos was foreseeable to Mr. Bell;

   And, four, that the defendant engaged in uncharged crack

1     transactions that were part of the same scheme or plan as the

2     offenses or convictions that added in totaled 1.5 kilos.

3          The objection then to the scope of the relevant conduct

4     included in the guideline calculation therefore is overruled.

5          With respect to the obstruction of justice objection.

6          The presentence report awards a two-point enhancement for

7     obstruction of justice based upon two events.

8          The defendant went to the home of Brittany O'Brien, a

9     juvenile who was believed to have witnessed the murder of a man

10    in whom she was interested, and the defendant asked her mother if

11    she was at home.  The visit was shortly after the murder, and the

12    mother moved herself and her daughter out of the household right

13    after that visit out of fear.  Ball and Wilson, two of

14    defendant's co-conspirators, were later charged with that murder.

15         The jury, understandably, acquitted the co-conspirators of

16    the murder, as the murder case against them ultimately rested

17    upon the testimony of O'Brien whose testimony was very

18    effectively discredited through defense cross-examination and

19    evidence put on by the defense.

20         The second event was the testimony of a security guard in

21    Congress Park, that the defendant made a threatening hand gesture

22    toward her.

23         Without more evidence of a willful motive, such as

24    intimidating words uttered to O'Brien's mother or gestures made

25    to her, or statements linking the hand gestures of the guard to

1    the investigation of the charged offenses, I am left to speculate

2    about the defendant's intent.

3        Given the seriously-weakened state of the trial evidence

4    inculpating the defendant's co-conspirators in the murder, the

5    defendants's visit could clearly have been intended not as

6    intimidation.  In addition, his gestures toward the guard may

7    equally have been calculated to keep the guard from obstructing

8    the defendant in his carrying out the relevant conduct.  Said

9    otherwise, "Don't get in my way while I'm selling drugs," rather

10   than purposely calculated to thwart the investigation that it

11   isn't clear the defendant knew was underway.

12       I do not find by a preponderance of the evidence that the

13   obstruction of justice enhancement is established.  That

14   objection is sustained and paragraph 60 shall be revised.

15       With respect to the acceptance of responsibility

16   objection, the presentence report denies the defendant a

17   reduction for acceptance of responsibility.

18       The defendant argues that he is entitled to it because he

19   was consistently willing to enter into a plea bargain but he and

20   the government could not agree on terms.

21       But the adjustment is not intended to apply to a defendant

22   who puts the government to its burden of proof at trial by

23   denying the essential factual allegations of guilt, is convicted,

24   and only then admits guilt.

25       The defendant here argued in closing to the jury that he

1    was not guilty of anything in the indictment, that the government

2    presented no credible witness against him, including Sandra White

3    to whom he made the tape-recorded sales, and asked the jury to

4    find him not guilty.

5         The defense did not admit at trial the sales Bell was

6    convicted of and argued to acquit him of everything else, a

7    scenario the circuit suggested in the 1998 *United States vs*

8    *Dozier* case -- D-o-z-i-e-r -- that might present an exception to

9    the ineligibility for the reduction.  That objection is

10   overruled.

11        With respect to the prior conviction objection.  The

12   presentence report scores the defendant's 1991 conviction for

13   carrying a dangerous weapon with one criminal history point.  The

14   defendant challenges counting that conviction because of its age

15   and the fact that it was a Youth Act sentence.

16        Guideline section 4A1.2(e)(2) counts any prior sentence

17   that was imposed within ten years of the defendant's commencement

18   of the offense of conviction.

19        The offenses of conviction occurred in 2000, less than ten

20   years after the prior sentence was imposed, and Youth Act

21   sentences are not ineligible to be counted.

22        In any event, counting or not counting that conviction

23   makes no difference in the criminal history category.  That

24   objection is overruled.

25        Finally, with regard to the weapons enhancement objection.

1          The defendant was not charged with or convicted of any

2   weapons offense, but the presentence report increases his offense

3   level by two points, concluding that a gun was possessed with

4   respect to the defendant's relevant conduct.   The defendant

5   challenges that enhancement.

6          One basis for the enhancement was Kellibrew's testimony

7   that, quote/unquote, "they always had guns," quote/unquote, "in

8   Antwuan Ball's house."

9          Now, that testimony did not place any guns in Bell's hands

10  or show any acquiescence by Ball's use of or possession of guns

11  in connection with the crack conspiracy.

12          The other basis was Pough's testimony -- that's

13  P-o-u-g-h -- that the defendant robbed a man of cash on the

14  street in Congress Park in 1991 or 1992 at gunpoint while another

15  assailant snatched the victim's neck chain.

16          I do not find that the preponderance of the reliable

17  evidence has established that the defendant's gun possession in

18  that incident was in connection with the offenses of conviction

19  in 2000 or the relevant conduct crack conspiracy which began in

20  1992.

21          However, the defendant's sentencing memorandum raised and

22  disputed a claim that the defendant possessed a gun, and the

23  government filed a response citing an additional basis for the

24  weapon enhancement.

25          Unrebutted trial evidence reflected that during a search

1    of the defendant's bedroom in the home defendant shared with his

2    father in 1996, during the life of the crack conspiracy, police

3    found a loaded handgun hidden in a speaker in the closet in

4    proximity to other tools of the narcotics trade, 49 Ziploc

5    baggies of crack on the closet shelf, plus two large white crack

6    rocks, a scale that weighed in ounces, a plate and razors with

7    residue, and $1,700 in cash.

8        The defendant's father testified disclaiming knowledge or

9    ownership of these additional items but claimed, not credibly,

10   that it was he who had found the gun outside and brought it

11   inside and placed it on his son's closet floor behind the

12   speaker.

13       The preponderance of the evidence supports the conclusion

14   that the defendant possessed a weapon in connection with the

15   relevant conduct.  That objection is overruled.  That, then, will

16   produce an adjusted offense level of 38 with a criminal history

17   category of 1.

18       Mr. Beane, do you care to speak on behalf of your client?

19       MR. BEANE:  Yes, I do, Your Honor.

20       Your Honor, under some of the considerations that the

21   Court may make when imposing sentence on Mr. Bell are the nature

22   of the offense, the actual crime itself, and then the

23   characteristics of Mr. Bell, as well as the considerations that

24   the sentence will have on society as well as society's interest

25   in what sentence the Court imposes.

1       To that end, I would want to start out by talking about

2   the witnesses that came forth before Mr. Bell and established

3   Mr. Bell's activities in Congress Park over the years of the

4   conspiracy and even before.

5       As the Court has already indicated, there is some evidence

6   the Court has found, I think by clear and convincing evidence,

7   that Mr. Bell was in fact involved in a conspiracy.

8       However, the level or the amount of time that Mr. Bell

9   will spend incarcerated as a result of being found to be involved

10  in a conspiracy I think more than quadruples the guidelines

11  without the relevant conduct -- and without the other

12  enhancements, the weapon.

13      Essentially, as opposed to looking at, I think, six or

14  seven years, Mr. Bell is now under the 292 months, I believe

15  looking at 24, 25 years because of primarily the relevant conduct

16  or the conspiracy.

17      The conspiracy was established through a number of

18  witnesses who were, in our opinion, not credible.  The reason

19  they're not credible is because of how their testimony was

20  obtained by the government.  In other words, almost all of them

21  were testifying pursuant to some type of plea agreement where

22  they would get a benefit if they helped out the government's

23  case.  And the plea agreements were basically clear that it was

24  up to the government as to whether or not they got time off their

25  sentence.  In other words, they had to satisfy the government.

1    Each and every one of these people understood that, and

2    they understood what the charges were.  And so our position is

3    they colored their testimony along those lines.

4    And I think one of the things that the Court can look at

5    is how uniformly these witnesses testified about Mr. Bell.  It's

6    difficult to imagine that 14 people would get up here and say the

7    same thing about the same person repeatedly.  Even if for some

8    reason we believed it was true, how do these people all say

9    exactly the same thing?  It was almost as if they had been

10   programmed to do so.

11   If the Court recalls, at one point I made an objection

12   during the course of the testimony because the government

13   prefaced all its questions about Mr. Bell as it began to get into

14   the particular area of Mr. Bell with, "What about Boy-Boy?  What

15   about Gregory Bell?"  Never did any of these witnesses say "and

16   Mr. Bell was also involved in this."

17   The government specifically said, "What about Boy-Boy?"

18   And then once the witnesses began to testify, they did not

19   testify in specifics, they testified in these huge generalities.

20   "Well, Mr. Bell or Boy-Boy sold me weight."

21   "Well, when did he sell you weight?"

22   "Well, about this time period."

23   "Well, how often would he sell you?"

24   "It depends."

25   Witness by witness gave a different variation of how often

1    Mr. Bell allegedly sold to them.

2         The ultimate problem for us, Your Honor, is that Mr. Bell

3    can't shoot at a moving target.  In other words, he can't mount a

4    defense to those witnesses because those witnesses won't give him

5    specifics to permit him to mount a defense.

6         By way of example, to the extent that Mr. Bell could mount

7    a defense and call witnesses in his defense, he did; and in some

8    instances, these witnesses did, in fact, contradict the witnesses

9    the government put on.

10        I would call the Court's attention to Detective Bruce

11   Faison who indicated that he knew Mr. Bell for a number of years,

12   would drive through the neighborhood repeatedly over the day or

13   from time to time, and often he would see Mr. Bell outside but

14   not engaging in narcotics transactions.

15        Detective Faison's testimony was really the only thing

16   that we could put forward to say that Mr. Bell did not sell

17   narcotics during that period, and all we could do was put forward

18   information that basically was scatter shot at that time period.

19        To the extent that Detective Faison's testimony did come

20   in, it did rebut some of the government's witnesses' testimony,

21   in particular Kairi Kellibrew, who would say that Mr. Bell was

22   out there all the time.  He was either, according to Kairi

23   Kellibrew, out there selling the drugs or inside playing Madden

24   football.

25        That simply isn't possible if Detective Faison's testimony

1   is true.  Detective Faison indicated that he would come through

2   the neighborhood from time to time, sometimes unbeknownst to

3   Mr. Bell, and observe Mr. Bell in the neighborhood.  That was his

4   job as a detective, to come through sometimes when he was on duty

5   to detect crimes, I guess is the best way to put it.

6         In any event, Your Honor, that was the best Mr. Bell could

7   put on to rebut the government's witnesses, and to the extent it

8   did rebut the witnesses, it undercuts the credibility of the

9   government's witnesses.

10        With regard to Ms. Craven and other supervisors of

11  Mr. Bell, they also, to a certain extent, undercut the

12  credibility of the government's witnesses.  They were not

13  permitted to testify to the full extent of their knowledge for

14  evidentiary reasons, but the Court was able to hear through

15  proffer some of what they would have said.

16        What they did say was that Mr. Bell was a hardworking

17  individual who came to work every day, worked overtime sometimes,

18  and also he had his own tow truck business that he operated.  All

19  of these things consumed time in Mr. Bell's life at a period when

20  the government's witnesses claimed he was selling narcotics all

21  the time or a great deal of his time.  That undercuts the

22  government witnesses' testimony regarding Mr. Bell's involvement.

23        The other thing, Your Honor, is sometimes all we have to

24  point to is evidence that something wasn't there.  In this

25  particular case the government claims that Mr. Bell sold over one

1    point, I think, four kilograms of crack cocaine.

2         The overriding question that is presented at that point

3    is, where did the money go?  If all of these drugs were worth

4    what the government said they were worth during the trial, where

5    is the money?

6         Their witnesses established that Mr. Bell drives an older

7    model car.  He has one car.  He bought two tow trucks to open his

8    own business through proceeds that he got as a result of a civil

9    suit and a settlement.  There is not a lot of money out there for

10   Mr. Bell.

11        I believe one of the government's witnesses -- and I'm

12   blanking on his name -- indicated that he had made so much money

13   that he was able to buy a nice house and invest this money.

14   That's not true of Mr. Bell.

15        So the government's -- ultimately, there's a void of

16   evidence to substantiate the government's witnesses' testimony.

17   It's our position that their testimony should not be relied upon

18   to give this man an additional 15 years, 10 or 15 years on a

19   sentence based on what they said and based on their word.

20        I think many of them during the course of the trial

21   admitted that yes, they lied; yes, they would be dishonest in

22   order to get this deal; yes, this deal was something that weighed

23   heavily on their mind.

24        And I know that there are courts out there who have

25   decided that when the Court is going to look at the testimony of

1   an informant or an addict informant, that the Court should be a

2   little more careful.  In this instance, there's another reason.

3        The government wants the Court to attribute a great deal

4   of narcotics to Mr. Bell based on these witnesses' testimony, but

5   not one of them could give the Court an actual amount.  They all

6   said an eight ball here or this amount here, but they never could

7   add up exactly what amount they claim Mr. Bell was responsible

8   for over a period of time.  So, in truth, we're left to guess

9   what that amount is.

10       The other thing we don't know is whether or not what

11  they're claiming that Mr. Bell sold them was actually crack.  We

12  don't know that.

13       At least one of the government witnesses claims that he

14  sometimes -- or other witnesses would sometimes sell --

15  essentially what was a knock-off, which was fake crack.  And so

16  we don't know what they're claiming he sold.

17       So, we believe that all of those things, the witnesses'

18  credibility, the fact that we don't know what the actual

19  substance was that they are claiming was sold, all add up to the

20  Court should not take their word on such a serious matter as to

21  how much Mr. Bell's life he should spend incarcerated.

22       So we think that as far as the conspiracy is concerned and

23  as far as his conduct is taken into consideration, the 3553, that

24  should not be a consider -- that should not be something that the

25  Court finds persuasive enough to further punish Mr. Bell.

1          With regards to another aspect that I think the Court

2     should consider, and that's actually what's going on in terms of

3     this case and why it was brought the way it was brought.

4          What was the government's motivation, for instance, to

5     dismiss a gun and drug charge against Mr. Bell almost ten years

6     ago in a 1996 case, but then to bring it in this conspiracy ten

7     years later.

8          What was it that caused them to dismiss other charges

9     against other co-defendants then and then bring them back now?

10         The truth of the matter is the only way that they get the

11    enhancements that they're looking for from the Court at this

12    point was to bring those charges in here now and to make those

13    allegations now after they've been dismissed because, as one of

14    the jurors -- I believe his name is Mr. Karim -- pointed out, he

15    did not believe the government would ever have brought those

16    cases unless they brought them under the umbrella of conspiracy

17    and that really is what's going on.

18         The only way the government gives the Court the permission

19    to sentence him to such a harsh level is if they bring it under

20    the theory of conspiracy.  Without the theory of conspiracy, then

21    a lot of the witnesses who the government brought in here that

22    they're relying on now never would have testified against

23    Mr. Bell, and so that information probably would not have been

24    before the Court.

25         So how, then, is the government -- what's really going on

1    is the government is looking for the Court to bail them out.

2    Because they couldn't prove it any other way, so they bring it as

3    a conspiracy and they count on the court to bail them out.  And

4    that's really what's going on in terms of the relevant conduct or

5    the acquitted conduct being attributed to Mr. Bell at this point.

6         It seems that it's probably more fair to punish Mr. Bell

7    for the conduct that they were able to convict him of and nothing

8    else; otherwise, it undercuts, I think, the fairness in our

9    system of punishing someone for something that they haven't been

10   convicted of doing wrong.

11        Now, I understand that the case law gives the Court the

12   discretion to do just that, to punish him for the acquitted

13   conduct or the relevant conduct, but with all due respect, just

14   because the Court of Appeals, or Congress, says the Court may do

15   it, it doesn't mean the Court should do it or has to do it.

16        And in this particular case, I think when you consider all

17   the things that are going on here, the reason this case was

18   brought this way, the evidence that this stuff is based on, and

19   on balance, it's not something that should be used to incarcerate

20   Mr. Bell for a substantial period of time.

21        Not to beat a dead horse with regard to obstruction of

22   justice and the other things that the government is going to ask

23   the Court, I believe under 3553, to consider -- the obstruction

24   of justice, the enhancement on the weapon, and the other

25   things -- I think the same argument is in place.

1      What is the basis of the information?  What does the

2  government base its request on?  And that again is the weak

3  testimony of the informants, the government informants, which

4  again should be looked at highly suspiciously, looked at in a

5  highly suspicious manner by the Court.

6      If I may, Your Honor.  Court's indulgence.

7      The other factors that I think the Court should look at is

8  actually Mr. Bell himself and the positive aspects of Mr. Bell.

9      We've established at this point Mr. Bell's negatives, but

10  does he have any positives to offer?  Because that is something

11  that the Court will consider in its sentencing under the statute.

12  And the Court was able to hear some of Mr. Bell's positives.

13      Detective Faison was the one who could give us the most

14  testimony about Mr. Bell's youth and what went on during his

15  youth and how he came up.

16      Detective Faison indicated that he had, in fact, caught

17  Mr. Bell, I guess, misbehaving, for lack of a better word.

18  Detective Faison straightened him up and basically put him back

19  on the path, a positive path.

20      Over the years, Detective Faison testified that Mr. Bell

21  was always coming out with some scheme to make money because he

22  wanted to earn money.

23      Mr. Bell had a van that he sold clothes out of.  Mr. Bell,

24  like I said, bought the two tow trucks.  Mr. Bell worked.  So

25  there are positives to Mr. Bell.

1        The other thing that Mr. Bell did was he was engaged in

2    the STEP Foundation that the Court heard a great deal about.  And

3    initially the government said that the STEP Foundation was just

4    another way -- and I may be remembering this wrong -- but it was

5    another method that Mr. Ball and others used to control the

6    neighborhood.  But I think Mr. Ball's attorneys did a pretty good

7    job of demonstrating to the Court that the STEP Foundation was

8    not some fraudulent foundation, that it had significant support

9    from the community, and that it was an organization that was

10   doing good in the neighborhood.  Mr. Bell participated fully in

11   that.

12        Ms. Craven would have testified to the number of meetings

13   that Mr. Bell attended.  I think there was a lot of information

14   conveyed to the Court in the bench conferences about what she

15   would say, and then we had to tailor our questions to go around

16   those -- actually, what was going on at those meetings to

17   demonstrate that Mr. Bell was at the meetings and, therefore,

18   could not be out there selling drugs the way some of the

19   government witnesses were saying.

20        But the point was that those meetings were for the STEP

21   Foundation, and the community was in here talking about how to

22   better the neighborhood.  Mr. Bell participated fully in that.

23        So that is a positive that Mr. Bell has going for him

24   that's not considered in the guidelines and should be considered

25   by the Court.

1        The other thing that Mr. Bell has going for him is he is a

2    family man.  He has 11 kids that he takes care of, that he was

3    taking care of before he was incarcerated before he was arrested

4    on this charge.

5        Those kids are now without the support of their father,

6    who was working two jobs and was vigorously pursuing his tow

7    truck business, and that was established by his supervisors who

8    all indicated that Mr. Bell would come in after he would finish

9    his normal job and start to ask to identify cars that needed to

10   be towed because that's how he could make extra money.  So there

11   are a lot of positives for Mr. Bell.

12       The other positive that I neglected to mention earlier was

13   the one conviction that happened so long ago.  Mr. Bell did

14   not -- has not been convicted of anything else since then.

15       That, I guess -- those are some of the positives.  I think

16   the Court will recall that there were other positives throughout

17   the trial that came up regarding Mr. Bell.

18       For instance, I think it was Gail Parson who indicated

19   that Mr. Bell had at one time taken her to a drug treatment

20   program to try to get her help, that he had purchased groceries

21   for her.  And I think Jacques Powell had to actually admit at

22   some points that Mr. Bell had assisted his mother in paying rent.

23       I know that Ms. O'Brien, Brittany O'Brien explained to the

24   Court that Mr. Bell was, in fact, somebody that she would go to

25   talk to sometimes and get advice about what was going on in her

1     life.

2          Mr. Bell was seen as one of the older people in the

3     neighborhood who could help the younger people go in the correct

4     direction.

5          And there was another witness who testified on behalf of

6     the government about a fight that broke out when some youngins

7     were throwing things at Mr. Bell and some of the other people,

8     and the witness -- I think it was Tenay Gross, I'm not certain --

9     the witness indicated it was Mr. Bell who was trying to keep the

10    peace.

11         So, those are positive things that were going on.

12         Another thing that the Court, I believe, should take into

13    consideration are the sentences that the other people who are

14    part of the alleged conspiracy received.  And I was able to find

15    some of the sentences by going on ECF, but there were other

16    sentences I couldn't locate.

17         But just by way of example.  I believe, according to the

18    ECF system, the Chow Wow, Gerald Bailey, got 51 months for his

19    involvement.

20         Gail Parson, I believe, was sentenced to one day.

21         Raymond Bell, 146 months.

22         Dominic Samuels, I believe, got 84 months.

23         Mary McClendon, all her charges were dismissed.

24         Phillip Wallace, 75 months.

25         Newett Ford, 262, I think was the highest so far that I

1    was able to find.

2         What I could find, of the people I could find out

3    information about, was all of them had more substantial records,

4    criminal records, than Mr. Bell had.  And I don't have their

5    presentence reports, so I'm not certain of that.  But through, I

6    guess, word-of-mouth and checking with other attorneys in the

7    system, I believe that those people who had those sentences had

8    other priors.

9         I say all this to say that Mr. Bell's sentence should fall

10   somewhere in relation to those other people.  And if those other

11   people -- and I believe this to be true -- if those other people

12   had prior convictions, they pled guilty to the conspiracy itself,

13   and they received these sentences, then Mr. Bell should be

14   sentenced somewhere on the same kind of a sliding scale based on

15   what he was convicted of.

16        He was convicted of the three sales of five grams.  That's

17   it.  He didn't plead guilty to the conspiracy and the massive

18   amount of drugs.

19        So, from that standpoint, Mr. Bell's ultimate sentence

20   should be substantially lower than some of the other people who

21   had the higher records -- the heavy records who were involved in

22   violence.

23        I don't know what Dominic Samuels received, but I believe

24   he pled guilty to a manslaughter, I believe, that was part of a

25   murder, and received -- and I think it's somewhere in like 84

1    months, is what it is.  He received a sentence of 84 months.  He

2    took a life.  I think in the scheme of things, is a life more

3    valuable than the sale of drugs?

4        And the government, I guess in the plea, waived off the

5    conspiracy, although I think the Court would have found that he

6    was, in fact, involved in the conspiracy.

7        All of those things taken together, I think, indicate that

8    Mr. Bell should receive less than what Dominic Samuels received

9    because he did not take a life in the whole scheme of the

10   government's allegations.  Mr. Bell did not take a life.

11       To sum up, Your Honor.  With regards to fashioning a

12   sentence that's appropriate for Mr. Bell, taking into

13   consideration all the things that I said prior to this, Mr. Bell

14   should be sentenced within the guideline range of, I believe it's

15   51 to 63 months because, really, that's what he's responsible

16   for, the crimes that he was convicted of.

17       I know the Court has found that he was involved in this

18   conspiracy -- not found -- but by clear and convincing evidence

19   based on the testimony that the Court heard from the government's

20   own witnesses.

21       But I would invite the Court to take into consideration

22   Mr. Bell's witnesses and then some of the information that the

23   Court was presented through Mr. Bell's witnesses as it now

24   considers, under 3553, how much of the conspiracy should Mr. Bell

25   be given credit for.  And I think when the Court does that and

1    recognizes just how much these other witnesses had to gain -- and

2    also remember that a lot of these witnesses -- I don't want to go

3    down the list -- but many of them are admitted to being involved

4    in robberies, admitted to being involved in shootings and

5    fightings and all kinds of violence, and it's the type of

6    violence that Mr. Bell was never even accused of.

7        Kairi Kellibrew, one of the more unsavory government

8    witnesses, talked about having sex with 14-year-olds.  In many

9    jurisdictions, that's statutory rape at the age he was, because

10   he clearly said he was driving.  He would not admit to what his

11   age was at the time, but he did say he at least had a driver's

12   license and was driving.  And I think a 16-year-old, 17-year-old

13   having sex with multiple 14-year-olds makes him a questionable

14   individual.  And that's testimony that the government relies on

15   to have the Court enhance Mr. Bell's sentence.

16       And I think, based on all those things, Mr. Bell does not

17   deserve anything near a sentence of 292 months, and we would ask

18   that he be given something substantially lower than even the 84

19   months that Dominic Samuels received.

20       Thank you.

21       THE COURT:  All right.  Thank you.

22       Mr. Leon.

23       MR. LEON:  Thank you, Your Honor.

24       I'm going to -- I may jump around about a bit.  I'll try

25   to be -- but I do want to address various points Mr. Beane made,

1    but let me see if I can start kind of with some large points.

2          As the Court knows and the case law indicates, now that

3    the Court has found a criminal history -- an offense level of 38

4    and a criminal -- and a criminal point of one, that is the

5    initial benchmark and starting point under the *Gaul* and *Kimbrough*

6    analysis.

7          And that's -- obviously, the Court can, and my sense is,

8    the court may likely depart downward from that initial benchmark

9    and starting point based on earlier ruling -- excuse me --

10   earlier sentence the Court gave, but I would -- that is the

11   starting point.

12         And I do want to at least make a few points, in part to

13   respond to Mr. Beane and in part to make them for this record

14   with this defendant, why we would respectfully submit that if the

15   Court is going to make a departure for crack powder reasons, for

16   other reasons -- which we understand the Court certainly has the

17   discretion to do -- that it consider not departing an incredibly

18   significant amount, and people can disagree as to what that

19   amount is.  Let me make the following points.

20         First, let me just clear up a couple of a factual

21   inaccuracies; I don't think they were intentional, but my memory

22   is different on a few issues than Mr. Beane's.

23         I do remember -- and these are minor, but some of them are

24   not minor -- Mr. Beane makes reference to Gail Parson getting

25   drug treatment and that his client, Mr. Bell, drove her to drug

1    treatment.

2         My memory is that there was testimony from her about that,

3    and I thought it was Antwuan Ball, not Gregory Bell.  It's a

4    minor point, but it's my memory.

5         My memory is more clear on this.  Mr. Beane made reference

6    to the fact that Mr. Gregory Bell testified -- excuse me -- there

7    was testimony in this case about a fight going on in Congress

8    Park and Mr. Gregory Bell was a peacemaker.  I'm pretty sure I

9    know the incident that he's talking about, and I think

10   Mr. Beane's memory is exactly wrong on that.

11        There was testimony in this case from Brittany O'Brien,

12   corroborated by at least one other person, whose name I forget,

13   that there was a fight in Congress Park in 2003 around the time

14   of the Michael Smallwood stabbing.  I believe shortly before, but

15   in that time period.

16        And there was a fight between Michael Smallwood and Travon

17   Shaw younger groups, the youngins, if you will, and the older

18   members of Congress Park, including Gregory Bell.

19        There was testimony on this record that Mr. Bell, Gregory

20   Bell, got up and yelled at Travon Shaw and Michael Smallwood and

21   specifically directed -- was screaming at them, telling them that

22   he's afraid of them -- excuse me -- that he is not afraid of

23   them, he's annoyed with them, tired of them trying to take over

24   the neighborhood.  There was testimony in the record about that.

25        There was testimony about an argument, and the testimony

1     was that Mr. Bell was angry that the youngins were trying to take

2     over what he and his friends had established.  And we introduced

3     that very testimony to exactly establish the bad blood between

4     Trevon Shaw and Antwuan Ball, et cetera.  So Mr. Beane, with

5     respect, is just wrong on that.

6          He talks about the testimony of Detective Faison as

7     somehow establishing the same negative that he says the

8     government shouldn't be trying to establish.  We think that this

9     record is clear.

10          Detective Faison, he's not even a detective anymore, I

11    don't believe.  He's a two-time admitted liar.  Incredibly --

12    incredibly incredible testimony in this case.  Obviously friends

13    with Mr. Gregory Bell, considers him family.

14         And basically my memory is that Mr. Faison got up here

15    basically to discredit Kairi Kellibrew, but his main purpose was

16    to get up and talk about the reputation of Kairi Kellibrew for

17    not being an honest broker, not being an honest guy.  And then he

18    said, "Oh, yeah.  By the way, I know and I like Gregory Bell, and

19    whenever I'm around him I don't see him dealing drugs."  That's a

20    bunch of nothing, with respect.

21         That's just some of the -- one last factual thing I

22    caught, and I'll talk about Dominic Samuels in a moment when we

23    talk about -- when I refer to equal sentences.

24         But Dominic Samuels only had the murder charge left.

25    There was nothing to plead him to.  So, Mr. Beane, I think was

1    talking about how the government could have pled Mr. Samuels out

2    to some drug charges or conspiracy charges.  That's not the case.

3         Dominic Samuels, there was acquittals on the -- I think it

4    was two drug charges, and the only thing remaining for him was a

5    very serious charge, murder, and that's what we were planning to

6    go to trial with him on, and that's what he pled to, and I'll

7    talk about that in a bit -- in a moment or two.

8         The Court, obviously, has a lot of discretion and

9    obviously the Court sat through this case.  To the

10   government's -- as we sat through the case and we sifted through

11   the evidence and we considered it, in our mind it was clear that

12   there were three defendants:  Antwuan Ball, David Wilson, and

13   Dominic -- excuse me -- and Desmond Thurston who were the most

14   violent, the most entrenched, also leadership with respect to

15   Antwuan Ball and David Wilson and committed a lots of robberies

16   and violence.

17        Of the next three, Gregory Bell certainly was at the top

18   of that next three in our judgment.  For one important reason,

19   Your Honor, more than Joseph Jones and more than Dominic Samuels,

20   Mr. Ball was entrenched in the conspiracy.

21        There was no question on this record that Mr. Ball, in the

22   words of Jacques Powell, was the wholesale king.

23        THE COURT:  You said Mr. Ball or Mr. Bell?

24        MR. LEON:  I misspoke.  I apologize.  That Mr. Gregory

25   Bell -- thank you -- was the wholesale king, in the words of

1    Jacques Powell.

2         And witness after witness after witness did testify with

3    reason that he was the guy to go to if you needed drugs.  He was

4    the guy to go to if you needed to buy drugs -- crack cocaine.

5         He was the guy to go to if you were a drug dealer in

6    Congress Park and were short.  You could go to Boy-Boy, you could

7    go to Gregory Bell, and you could get re-upped.  You could get

8    supplied.  You could get your wholesales.

9         Mr. Gregory Bell is a 38-year-old man who did quite well

10   in Congress Park, and this record is clear that he is by far --

11   was by far the most prolific drug dealer in Congress Park.  He

12   held an incredible vital role.  He was entrenched in this

13   conspiracy, and he, I think on this record, more than anyone by

14   far held this narcotics conspiracy together, kept Congress Park,

15   the dangerous neighborhood that it was.

16        And I'll just refer to the sentencing memo on a few points

17   on this.  We put the chart together on page 11.  The chart is

18   telling.  It shows -- the record is clear on this.

19        The FBI was looking at Congress Park from -- starting in

20   about 2000 and the takedown was March 22nd of 2005.  You look at

21   that chart.  June of 2000 is the first time Gregory Bell made a

22   controlled purchase that was recorded by the FBI.  The very last

23   one is March 2nd of '05, just days before the takedown and

24   everything in-between.  Gregory Bell was at it day in, day out,

25   all the time, just as the witnesses said time after time after

time.

There's a reason that Kairi Kellibrew, a witness that the Court has credited now, referred to an alley as *Boy-Boy's alley*. He was doing this all the time.  He did this constantly.  And as -- I'll just leave it there for now.

So, with the understanding that the Court may likely depart downward from the starting point and benchmark, we would ask the Court to at least strongly consider the fact that to our ears, and as we considered and listened to the evidence, Boy-Boy, Gregory Bell, was one of the foremost entrenched members of this conspiracy.  He was the most -- he had a vital role in this conspiracy; certainly more than Joseph Jones, certainly more than Dominic Samuels with respect to the conspiracy.

Mr. Bell disparages many people.  I forget the exact word he used to put down Kairi Kellibrew.  It's worth noting.  Kairi Kellibrew, I think we can all agree he's got a lot of problems and he's done a lot of bad things.  Kairi Kellibrew has admitted that as well.

Kairi Kellibrew was mentored by Gregory Bell.  Kairi Kellibrew was mentored by Antwuan Ball.  Kairi Kellibrew is ten years the junior, at least ten years the junior, I believe, of Gregory Bell.

Kairi Kellibrew became in part the person he is, the person who's now being disparaged by Gregory Bell, because of Gregory Bell.  And I just think that's ironic, to say the least.

1        But again, Kairi Kellibrew is unfortunately a poster child

2   for what the Congress Park neighborhood sometimes produced.  It

3   produced, obviously, a lot of brave citizens, it produced a lot

4   of great citizens, but the Kairi Kellibrews of the world were

5   produced by the Gregory Bells of the world, in part at least.

6        Mr. Bell referred to cooperating witness saying that the

7   government relied only on cooperating witnesses.  That's

8   certainly not true.

9        Marilyn Proctor, who's in the sentencing memorandum, was

10  not a cooperating witness.  Steve Marsh, who testified at this

11  trial, is just one of several examples of people who had no

12  cooperation agreements in this case.

13        And there's a lot of ample evidence in this record of the

14  danger of this conspiracy, and some of them are from cooperating

15  witnesses, some of them are not.

16        Another error that Mr. Beane made, but it's relevant to my

17  allocution, Your Honor, is Mr. Beane's argument, well, there was

18  too much generality, where was the specificity?  Kind of the

19  argument, *Well, I have to prove a negative here that Mr. Gregory*

20  *Bell was not a day in, day out drug dealer.*

21        I would direct the Court and Mr. Beane just -- as one

22  example to the testimony of Cedric Conner, which we cite on pages

23  17 and 18 of our memorandum.  We cited a specific place in the

24  transcript, and it's here.

25        Mr. Conner testified that when he sold to Gregory Bell he

1   often sold him in the range of a 31 to a 62 of crack cocaine,

2   approximately two or three times a month in 1999 and 2000.

3   That's specific.

4        That witness was cross-examined and he talked about it,

5   and this Court has credited that witness.  And this Court has

6   correctly said that that alone, that witness alone, for just that

7   limited period of time, is worth at least a thousand grams,

8   meaning one kilogram of crack cocaine in the hands of Gregory

9   Bell.  It's a good example of the entrenchment of how vital of

10  the role that Gregory Bell played.  So there was specificity.

11       He makes reference to the STEP Foundation.  I'm not going

12  to say much about that.  Obviously, the government has a

13  different take on the Step Foundation, but there is certainly

14  evidence on this record that the STEP Foundation, the leader of

15  the STEP Foundation, Antwuan Ball, while he was purportedly

16  protecting and trying to help the community also had an office

17  with a COSU poster and, obviously, had strong feelings about

18  cooperation and snitching.  And based on the allocution -- there

19  was a poster in the office that was admitted in this record, and

20  that's an organization that Mr. Gregory Bell apparently proudly

21  associates himself with.

22       He talks about all the good that Mr. Bell did, Gregory

23  Bell did.  I'm not here to say that he's bad in every way.  Of

24  course, no person is.  But we gave the example in our reply

25  memorandum about how, while he's working a construction job, he's

1  trying to race off and make some real quick hard fast money

2  selling drugs to crack addicts like Sandra White.

3       At the same time he's working and trying to rebuild the

4  community working for the Step Foundation, he's threatening

5  security officers like Donna Brown.

6       At the same time he's apparently trying to rebuild the

7  community, he's associating himself with the Step Foundation and

8  dealing drugs.

9       Two other very quick things, Your Honor.

10      Just a final point on the earlier things.  The, the, the

11 off the word entrenchment, which I keep using.  Gregory Bell was

12 with this conspiracy from its inception, 1992, 1993.  That's from

13 the testimony of Kairi Kellibrew and others.  And, Bobby Capies

14 and others.  There's evidence of that on this record from various

15 witnesses.  And again, in Gregory Bell up until just days before

16 the takedown is out there hustling and selling crack cocaine.

17      Finally, with respect to other sentences -- and,

18 obviously, that is one of several considerations the Court can

19 and should and I'm sure will take into consideration -- Gail

20 Parson didn't have any prior convictions.  In some ways, it's

21 apples and oranges.  I'm not going to go through every witness

22 here.

23      I will, though, with respect to Joseph Jones, who

24 certainly is in a -- while he's in a different profile is

25 certainly in a very similar posture.  In our judgment, the

1    government's judgment, Mr. Jones was less entrenched in this

2    conspiracy.  He was less vital to certainly the narcotics

3    conspiracy.  That's our judgment based on sitting through all the

4    evidence the way this record played out.

5          And Newett Ford, who got 262 months.  Mr. Ford, my memory

6    is that he did have two prior convictions for distribution, which

7    certainly counted against him, but he was by all measures -- his

8    name barely came up in this case for a reason.  He was a

9    nonviolent, low level flunkie for Burke Johnson, and he had 262

10   months from this court.  Again, a different posture, but in some

11   ways it's apples to oranges.

12         Could I just have one moment, Your Honor?

13         THE COURT:  Yes.

14         (Discussion had off the record.)

15         MR. LEON:  Thank you very much for your time, Your Honor.

16   I have nothing further.

17         THE COURT:  All right.  Mr. Bell, would you like to say

18   anything?  Mr. Beane.

19         MR. BEANE:  Yes.  May I just offer I guess a short

20   rebuttal to what the government said right now.

21         THE COURT:  I'll give you a moment, yes.

22         MR. BEANE:  Thank you.

23         Just briefly, Your Honor.  With regards to any

24   inaccuracies I may have said while I was up here.  I apologize.

25   That was not my intent.

1        With regards to being inaccurate about the number of

2   witnesses who were testifying under plea agreements or me

3   saying -- talking about them, I never said that all of their

4   witnesses were under plea agreements.  I said primarily the ones

5   that were supporting the conspiracy were, and primarily, not all

6   of them, so that was not an inaccuracy or wrong as Mr. Leon said.

7        With regards to detective or former Detective Faison being

8   not credible because he lied twice.  That's clearly a *What's good*

9   *for the goose is good for the gander* argument.

10       The government's witnesses, who they are saying are

11  reliable, also got up there and said that yes, they lied.

12       Detective Faison was not testifying under agreement.  But

13  more importantly, Detective Faison was a decorated detective.  He

14  testified that then-U.S. Attorney Wilma Lewis actually gave him a

15  certificate awarding him *Detective of the Year*.  So, I don't

16  think it's fair to come here now for the government to say that

17  he absolutely lied on the record simply because he knew Mr. Bell.

18       As far as Cedric Conner went with regards to the amounts

19  or the specificity.  Mr. Conner makes our point.  He gives a

20  year, a span of time, several years, as the government points

21  out, and then a significant amount of weight per sale, but he

22  doesn't give us anything that we can put up a defense against

23  other than what we did.

24       We called in the witnesses we knew who could -- who could

25  account for where Mr. Bell was at the times that we knew about,

1    Detective Faison and his supervisors, but other than that, we

2    could not rebut what they said because of the lack of

3    specificity.

4         There is a certain amount of unfairness in that, and

5    that's all we're asking the Court to take into consideration, is

6    that we can't rebut what they don't give us.  In other words, if

7    they don't give us a target we can't hit it.  To say he sold

8    drugs over a vast period of time and say, "Now, come forward and

9    prove you didn't," we can't do that, and we think the Court

10   should take that into consideration as you consider the fairness

11   and that's what we were saying on that point.

12        Thank you.

13        THE COURT:  Mr. Bell, would you like to say anything?

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  Was that a yes or a no?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  Yes?

18        THE DEFENDANT:  Yes, sir.

19        THE COURT:  You can come forward.

20        THE DEFENDANT:  Thank you, Your Honor, for giving me a

21   chance to say something.

22        For the record, I want to apologize to my family, my

23   mother, my girlfriend, my kids, and for taking up the Court's

24   time as far as all the money they spent on my behalf.

25        And I would like to say that as far as the Court spending

1   as much time and effort to prosecute me, me knowing my time and

2   effort I put into the community, I feel as though I should

3   have -- just have some type of leniency and lay my feet down to

4   the Court.

5       I was willing to go off and do a certain amount of time

6   that I should have been responsible for, but I -- from the grudge

7   of the government and how biased they were against me -- I heard

8   my lawyer several times to say, *Give me a certain amount of time*

9   *and I'll go lay down.*

10      But I don't know why they wouldn't just give me an

11  opportunity to just go do some time, and they wanted me to go

12  through this and they wouldn't let me get my time, but I don't

13  want to sit here and bicker and cry about the situation.

14      I just wanted to apologize to my family, my mother, and to

15  the Court for wasting valuable time, and it's just a

16  mis-speculation about me and who I was when they laid down the

17  pattern of who I was.

18      So, I'm just going to sit back and see what the judgment

19  going to be.  I apologize to my mother and my girlfriend and my

20  sisters and my kids.

21      Thank you.

22      (Pause)

23      MRS. BELL:  Your Honor, may I say something?

24      MR. BEANE:  Your Honor, I hear Ms. Gregory Bell's mother

25  asks to say something to address the Court.

1          THE COURT:  You may report to me whatever it is that she

2     wants to say, but I'm not going to have additional people coming

3     up.

4          (Discussion had off the record.)

5          MR. BEANE:  Thank you, Your Honor, for the opportunity to

6     speak with Ms. Bell.

7          Essentially, the message that Ms. Bell would like to

8     convey to the Court, I think goes to an issue the Court has

9     already talked about, and that's the obstruction of justice

10    charge with regards to the O'Briens.

11         I think the Court may recall from the testimony that

12    Ms. Bell lived very close to the O'Briens.  Mrs. Bell wants me to

13    convey to the Court that she knows that Ms. O'Brien -- that move

14    was not because of something that Gregory Bell did, but because

15    of some trouble Ms. O'Brien's son may have gotten into in regards

16    to the actual murder, and so I present that to the Court on

17    behalf of Ms. Bell.

18         THE COURT:  All right.  Thank you.

19         Let me make clear several principles that will cabin my

20    sentencing discretion.

21         One argument that has lost force is that a sentence within

22    the prescribed sentencing guidelines range is, per se,

23    reasonable.  In some cases it may be reasonable, but in other

24    cases it might not be.

25         If sentencing judges must simply sentence in lockstep with

1    all sentencing guideline ranges, we risk resurrecting the very

2    evil that Justice Stevens's substantive opinion in *Booker*

3    identified, especially when a sentence is enhanced based upon

4    judicial fact-finding.

5         *Booker* still requires us to calculate and consider the

6    guideline range in reaching fair and reasonable sentences.  I do

7    not read *Booker* to hold that all sentences within the guideline

8    range are, per se, reasonable.

9         As our circuit has said in *United States vs Dorcely* --

10   D-o-r-c-e-l-y -- "A guideline sentence should be accorded merely

11   a rebuttable presumption of reasonableness."

12        Indeed, the Supreme Court made clear in 2007 in *Rita vs*

13   *The United States*, that "the presumption is nonbinding and,

14   quote, applies only on appellate review.  The sentencing court

15   does not enjoy the benefit of a legal presumption that the

16   guidelines should apply.  Closed quote.  Nor does the

17   presumption, quote, require the sentencing judge to impose that

18   sentence," closed quote.

19        That is not to say, though, that we must shun any sentence

20   within any guideline range calculated based upon facts not found

21   by a jury.

22        This circuit has held that the error is not that a judge

23   determines facts under the guidelines which would increase a

24   sentence beyond that authorized by the jury verdict or an

25   admission by the defendant, the error is only that a judge does

1    so in a mandatory guidelines system.

2         Another theory is that the sentencing factors in 18 U.S.C.

3    3553 are already taken into account in the guidelines formulation

4    and make superfluous separate consideration of those factors.

5    That approach renders Justice Breyer's remedial opinion a

6    nullity.  These guidelines now are advisory, not mandatory.  We

7    must consider them and we must consider the other 3553 sentencing

8    factors, not ignore them on the theory that considering them

9    unnecessarily duplicates what the guidelines have done.

10        Our circuit has confirmed that in *United States vs*

11   *Pickett* -- P-i-c-k-e-t-t -- the *Rita* case, too, is consistent

12   with that approach.  Since this is a case involving guideline

13   enhancements prompted by evidence not admitted by the defendant

14   or found by the jury, I will not irrebutably presume that the

15   guideline range generated by that evidence is warranted, out of

16   respect for the majority opinion by Justice Stevens and for the

17   *Dorcely* opinion.

18        Mr. Bell, would you and your lawyer come forward to the

19   podium.

20        The law requires that I consider numerous factors in

21   determining your sentence.  One is the need for the sentence

22   imposed to promote respect for the law.

23        I have conducted voir dire of hundreds of prospective

24   jurors over the years.  When prospective jurors have come forward

25   in response to the standard question of whether they have strong

1    feelings about punishments assigned to drug offenses that could

2    keep them from being fair and impartial, they have invariably

3    complained of the unfair disparity between punishments for crack

4    and powder cocaine.  They are not alone.

5        The Sentencing Commission, whose expertise the *Booker*

6    court has said is entitled to great weight, have drawn the same

7    conclusion.  They have acted now four times to try to reduce or

8    eliminate that disparity from the guidelines.  Their efforts were

9    not without a basis.

10       The Commission hired Professors Peter Rossi and Richard

11   Berk -- B-e-r-k -- to conduct a study comparing the severity of

12   sentences under the guidelines with the severity of sentences

13   deemed just by the public.

14       In their 1995 study published in the 1995 book entitled,

15   quote, *Just Punishments, Federal Sentencing Guidelines and Public*

16   *Views Compared,* closed quote, the professors stated, quote, "The

17   guideline sentences for drug trafficking were established by the

18   Commission in a different fashion than the other crimes.

19   Congress had mandated a specific set of penalties for drug

20   trafficking crimes which were incorporated into the guidelines.

21       Unlike the procedures used in setting sentences for other

22   crimes, the commission disregarded past sentencing practices for

23   drug trafficking crimes as well as whatever understanding the

24   commissioners may have had concerning the preferences of the

25   American public.

1        Our findings shows show that the congressional mandates

2    departed strongly from those preferences," closed quote.

3        Specifically Table 5.5 of the study shows that the public

4    drew virtually no distinction between crack and cocaine powder

5    trafficking and found it to be fair and just those sentences far

6    closer to powder cocaine sentences under the guidelines than

7    crack sentences.

8        Moreover, some of the bases upon which the crack penalties

9    were predicated have been discredited.

10        In the commissioners's May 2002 report to Congress,

11    *Cocaine and Federal Sentencing Policy*, they stated that the,

12    quote, "addictive nature of crack cocaine independently does not

13    appear to warrant the 100-to-1 drug quantity ratio.  Recent

14    research reports no difference between the negative effects from

15    prenatal crack cocaine and powder cocaine exposure, so no

16    differential in drug quantity ratio based directly on this

17    particularly heightened harms appears warranted," closed quote.

18        The report added that, quote, "recent data indicate that

19    significantly less trafficking-related violence or systemic

20    violence as measured by weapon use and bodily injury documented

21    in presentence reports is associated with crack cocaine

22    trafficking offenses than previously assumed," closed quote.

23        In this case, if that corresponding guideline disparity

24    were evened, the base offense level reflected in paragraph 56 of

25    the presentence report for over 1.5 kilos of crack cocaine would

1    be 26, producing a total offense level of 28.  With a criminal

2    history category of one, the guideline range would be 78 to 97

3    months.

4         A sentence several offense levels above that range in this

5    case in my judgment would help promote and restore respect for

6    the drug laws and provide for proper punishment, deterrence, and

7    recognition of the severity of the defendant's offense conduct.

8    It may not, however, avoid the kind of sentencing disparity about

9    which Congress was concerned.

10        Another factor, Mr. Bell, I have to consider is the nature

11   and circumstances of these offenses.

12        For over a decade you were regularly pumping poison in

13   substantial quantities into this community.  You did it with many

14   others, multiplying the number of strung-out people you helped

15   keep strung out.  You lined your own pockets and lessened the

16   lives of countless others.  And you, of all people, knew better,

17   knowing how drug abuse ruins parents and children and families.

18        And it was deplorable to hear that you, as a 24-year-old

19   man, got Kairi Kellibrew started off selling crack when he was

20   just a 14-year-old boy.  This is not community building.  It is

21   community destruction, and it deserves substantial punishment.

22        THE DEFENDANT:  It's a lie.

23        THE COURT:  Another factor is your history and

24   characteristics.

25        You suffered from not having your father in your life and

1  from pressures brought upon you to perform beyond your means and

2  abilities.  Although I am, though, a bit perplexed about that

3  claim and you telling the probation officer that you hadn't seen

4  your father in years and didn't know where he was, since your

5  father came in here and testified and he said you had lived with

6  him for a while.

7      THE DEFENDANT:  Your Honor, that's a lie, Your Honor.  I

8  would never tell -- I just seen my father.  He just testified.  I

9  just seen my father.  I did not tell him that, that I did not see

10  my father.  That is a lie, Your Honor.  That is a cold lie right

11  there, Your Honor.

12      THE COURT:  All right.  I'll take what you have said,

13  then.  But nevertheless, in mentioning other matters, you have

14  lived with parental drug abuse in your early years.  You began to

15  abuse marijuana and alcohol early in your childhood, and you

16  never finished high school.  Despite that, you did manage to

17  obtain a welding certificate, obtain a commercial driving

18  license, learn and use construction skills, and start a tow truck

19  business.

20      As well, exposing you to the applicable range I have

21  determined of 235 to 293 months is a far cry from the far lower

22  range applicable solely to the three small amounts of crack that

23  the jury found that you sold.  That gross disparity in these

24  circumstances are all mitigating factors.

25      Other factors are the kind of sentences available and the

1   kind of sentence and sentencing range recommended by the

2   sentencing guidelines.

3        As I've already determined, the guidelines recommend a

4   sentence between 235 and 293 months in prison at level 38,

5   category one, although the law also provides for as little as one

6   day in prison to up to 20 years in prison on each count as well

7   as terms in-between.

8        Another factor is in the pertinent policy statement issued

9   by the U.S. Sentencing Commission.  The government has cited

10  section 5G1.2(d), which states that "if the total guideline range

11  punishment is greater than the highest statutory maximum, the

12  sentence on one or more other counts of conviction should be run

13  consecutive to produce a combined sentence equal to the total

14  guideline range punishment."  That does not apply here since 20

15  years falls within the guideline range.

16       The final factors are the need to provide restitution,

17  which is not applicable here, and the need to avoid unwarranted

18  sentencing disparities among defendants who have been convicted

19  of similar offenses.

20       Unbridled by the sentencing guidelines, I would find here

21  13 years to be a fair sentence that amply and properly addressed

22  the sentencing factors and goals articulated by Congress in the

23  other subsections of Section 3553.  But I am not unbridled by the

24  guidelines.

25       The Supreme Court requires that I consider the guidelines

1    and not ignore them, just as I must consider all of the Section

2    3553 sentencing factors in reaching a sentence.

3          Some of the factors exert downward influences on the

4    sentencing calculus in this case, others are neutral, and still

5    others exert upward influences.

6          The jury has found that the government has not proven

7    beyond a reasonable doubt the charged narcotics conspiracy.  I

8    respect and abide by that verdict, but I cannot turn a blind eye

9    to the narcotics conspiracy relevant conduct that I have found

10   proven by clear and convincing evidence.

11         The guidelines here exert upward influences and I am not

12   free to simply disregard that anymore than I am free to disregard

13   the Section 3553 factors exerting downward influences.

14         I must ultimately, though, assure that the sentence is

15   sufficient, but not greater than necessary, to reflect the

16   seriousness of the offense, to promote respect for the law, to

17   provide just punishment and adequate deterrence, to protect the

18   public, and to provide you with needed educational or vocational

19   training, medical care, or other correctional treatment in the

20   most effective manner.  I will do that, but 235 to 293 months in

21   prison does not honor that command.

22         The sentence will be equivalent to one falling within an

23   offense level of 36, criminal history Category 1.

24         It's the judgment of this Court that you, Gregory Bell,

25   are hereby committed to the custody of the Bureau of Prisons for

1    a term of 192 months on each of Counts 5, 9, and 12 to be served

2    concurrently.

3         You are further sentenced to serve a 36-month term of

4    supervised release concurrently on each count, and to pay a $100

5    special assessment on each count, for a total of $300.  The

6    special assessment is immediately payable to the clerk of this

7    court.

8         Within 30 days of any change of your address, you must

9    notify the clerk of this court of that change until such time as

10   your financial obligation is paid in full.

11        You shall make payments on the special assessment through

12   your participation in the Bureau of Prisons' Inmate Financial

13   Responsibility Program.  I find that you do not have the ability

14   to pay a fine and I, therefore, waive imposition of a fine in

15   your case.

16        Within 72 hours of your release from custody you must

17   report in person to the probation office in the district to which

18   you are released.

19        While you are on supervision, you must not possess a

20   firearm or other dangerous weapon.  You must not use or possess

21   any illegal controlled substance, and you must not commit another

22   federal, state, or local crime.

23        You must also abide by the general conditions of

24   supervision adopted by the U.S. Probation Office as well as the

25   following special conditions.

1      You must submit to the collection and use of DNA

2 identification information while you are incarcerated in the

3 Bureau of Prisons or at the direction of the U.S. Probation

4 Office.

5      You must also participate in and successfully complete a

6 residential and/or outpatient substance abuse treatment program,

7 which may include drug testing and detoxification service as

8 approved and directed by the probation office.

9      You must also participate in an educational vocational

10 skills training program as approved and directed by the probation

11 office.

12      The probation office shall release the presentence

13 investigation report to all appropriate agencies in order to

14 execute the sentence of the Court.  Treatment agencies shall

15 return the presentence report to the probation office upon the

16 defendant's completion or termination from treatment.

17      Mr. Bell, you have the right to appeal the sentence that I

18 have just imposed.  If you choose to appeal, you must do so

19 within ten days after the Court has entered judgment in this

20 case.

21      If you are unable to afford the costs of an appeal, you

22 may request permission from the Court to file an appeal at the

23 expense of the government.

24      Counsel, are there any other things we need to take up?

25      MR. BEANE:  I would like to make three -- two requests,

1    Your Honor.

2        One, since the Court did find it would be enhancing

3    Mr. Bell's sentence on the gun possession, Mr. Bell spent a

4    significant amount of time incarcerated pending trial on that

5    case before it was dismissed, and we would ask that the Court

6    grant Mr. Bell time for the time -- time served for that amount

7    of time that he was actually incarcerated on that charge.

8        And I'm just not -- I don't recall specifically, but I

9    think I did.  I wanted to make sure that the Court -- that it's

10   in the record that we are objecting under the Sixth Amendment --

11   we're objecting to the sentence under the Sixth Amendment as well

12   as the line of cases:  *Apprendi*, *Booker*, and I wanted to make

13   sure that was on the record.

14       I did want to just mention one thing that Mr. Bell was

15   fairly adamant about, and that was the allegation of Kairi

16   Kellibrew, that he was mentored in any way by Mr. Bell.

17       Of all the things that Mr. Bell admits to, I have never

18   seen him react so negatively as to the allegation from Kairi

19   Kellibrew that he was mentored by Mr. Bell.

20       Based on the witnesses I spoke to, Mr. Bell and other

21   people in the community, Kairi Kellibrew just is not credible and

22   was not mentored by anybody but was called what is -- what was

23   referred to in the neighborhood as a *wannabe*.  He wanted to be

24   involved in almost everything and would lie to get there.  And I

25   wanted to present that to the Court and let the Court know that

1   is what Mr. Bell was objecting to so strenuously.

2       THE COURT:  Mr. Bell, you may have a seat.

3       Mr. Leon, I guess all you have to respond to is the credit

4   for time served while Mr. Bell was detained on the charge in

5   relation to the 1996 search warrant gun case.  What was it?

6   1996?

7       MR. LEON:  It was August 1996, and we would object to that

8   for a couple of reasons.

9       One is we do think, and it's possible -- well, we believe

10  there are several reasons for the gun enhancement.  I don't know

11  if the only reason the Court gave the gun enhancement was that

12  '96 search warrant, so if there's a disconnect there --

13      THE COURT:  The answer is it was.

14      MR. LEON:  It was?  Okay.

15      The other -- the other point I'll make generally is that

16  the -- certainly that gun enhancement for that gun that day, the

17  loaded gun in the closet, which I understand the Court to have

18  attributed; based on the same findings and credibility findings

19  against Mr. Raymond Bell, Sr. and the findings of all the other

20  paraphernalia and scale and drugs in that same closet, there was

21  a bullet, separate bullet, which did not link to that armed

22  loaded pistol.  So I think on the Court's still finding on that

23  search warrant, there's certainly a reasonable conclusion that

24  there's another gun that Mr. Bell possessed.  That's a fine

25  point, but let me just make it.

1     The other more general point, leading from the micro to

2   the macro, it's my understanding the Court certainly went through

3   a guidelines analysis, but then at the end of the day went off

4   the guidelines and factored in the guidelines, but at the end of

5   the day said, If it was up to the Court, without the guidelines,

6   there would be a 13-year sentence, the guidelines are a factor,

7   and then made it's own adjustments under 3553 and other

8   considerations.

9     So, perhaps I'm conceiving this incorrectly, and if I am,

10   I am, but the additional larger point I would make is this is not

11   a true straight guidelines sentence, and for that reason, the gun

12   bump, while relevant, is less so because the Court factored in

13   3553 factors as well as other factors that the Court made part of

14   this record.  So that's a larger point.

15     So the final point, getting back to a macro point, I don't

16   know, as I stand here -- Mr. Beane is correct that Mr. Bell was

17   arrested that day and it was an arrest that happened in District

18   Court, that's correct.  That's all I know.

19     If there was any incarceration, what the length of that

20   incarceration was, I don't know.  I know that it was dismissed by

21   the government.  I don't know the reasons or the circumstances as

22   I stand here, but it may not have been very much time at all.

23   But that's just an additional thought I had.

24     THE COURT:  Well, I would certainly have to call on

25   Mr. Beane to provide details about what kind of time he's talking

1    about.  But, as a matter of principle, if indeed -- and I have

2    enhanced his sentence based upon attributing to him that he

3    possessed a gun during the course of the narcotics conspiracy in

4    1996, which is a fact that was not found by the jury or admitted

5    by him.  The argument by Mr. Beane is that it would be fair to --

6    it would be fair to allow the sentence to credit the time he

7    served, if there was some time that he served in detention, for

8    any charge against him pending in connection with his possession

9    of that gun.  That's the principle.  If you want to add anything

10   else I was asking you to respond to.

11       MR. LEON:  I'll make one other final smaller point --

12   well, related point.  I won't characterize it as smaller.

13       I don't know until Mr. -- if the Court is inclined to

14   consider this request -- if the Court is -- certainly Mr. Beane

15   and I would have to go and look at the record and find out if

16   there was incarceration; if so, for how long.  And if so, then I

17   would respectfully submit we look at the -- we order up the

18   transcript of that hearing.

19       The reason for that is my -- I don't know, but it's

20   certainly possible that that detention, the ruling by the

21   magistrate or the judge who ruled for the detention, may likely

22   have been -- and I'm basing this on my own experiences in

23   court -- for the large amount of drugs and not for the gun as

24   well.

25       So, if we're really going to get down to brass tacks on

1    this narrow issue, let's find out why he was detained.  It's

2    possible the judge may have -- or the magistrate judge made a

3    finding that because of this -- because of the large amount of

4    drugs, that triggers a rebuttable presumption because it's ten

5    years or more, so on and so forth; the gun didn't factor in

6    arguably to that detention.  I don't know.

7         But if there's homework to do, I submit that Mr. Beane do

8    it, and I would be happy to work with him and look at any record

9    or materials there are.

10        THE COURT:  Mr. Beane, it certainly does fall to you to

11   present the details I need to know.  If he was in detention, I

12   need to know what the number of the case was.  I need to know

13   what the beginning date and end date of the detention might have

14   been.  I certainly would want to know what the complaint charged,

15   if he was in detention on a complaint.  But you would carry the

16   responsibility for presenting all of that, in any event.

17        MR. BEANE:  I think Mr. Penders can help us out briefly.

18        MR. PENDERS:  Paragraph 77, Your Honor, reflects that

19   arrest, and it appears that he was arrested in August and the

20   charges were dismissed in November.  I think we're talking about

21   a three-month period.

22        If the Court would wish to -- care to take a brief recess,

23   I could run to my office and pull up the Department of

24   Corrections records and get the exact date that he was admitted

25   and the exact date that he was released for that count.

```
1          THE COURT:  All right.  Well, I would want to know the

2     dates, but I would also want to know what the complaint charged.

3          MR. BEANE:  Which complaint?

4          THE COURT:  I'm sorry.  This paragraph reflects possession

5     with intent to distribute cocaine base.  The paragraph does not

6     summarize also a weapons possession charge.

7          As I understand the theory, the theory is if he's had his

8     sentence enhanced because of the gun, if he were charged with a

9     gun and detained on a gun charge, he would ask to have that time

10    credited to him, so I would want to know what the complaint

11    charged.

12         MR. BEANE:  That answer may be directly found within ECF,

13    Your Honor, under the case number as listed.

14         THE COURT:  Well, Mr. Beane, it's your responsibility to

15    get me those details.  You do it however you want.

16         What is your proposal?

17         MR. BEANE:  My proposal is that -- if it the court has

18    time -- to take a 10-minute or a 15-minute break while

19    Mr. Penders attempts to ascertain that, and I'll be more than

20    happy to --

21         THE COURT:  All right.  Well, it's your responsibility,

22    not Mr. Penders.  So you have to come back to me with

23    information, not anybody else.  So what is your proposal?

24         MR. BEANE:  My proposal, then, is -- may I have a moment

25    with Mr. Penders?
```

1      THE COURT:  Yes.

2      (Discussion had off the record.)

3      MR. BEANE:  Can we break for 15 minutes, Your Honor.

4      THE COURT:  Any objection?

5      MR. LEON:  No.

6      THE COURT:  All right.  We'll be in recess for 15 minutes.

7      I would also want to know if you have any authority for

8  the proposition that that would be doable, that I can do that,

9  aside from whether it's appropriate to do it.  So, that's what I

10  need to know:  the dates, what the complaint charged.

11      MR. BEANE:  Certainly.

12      THE COURT:  We'll be in recess for 15 minutes.

13      (Thereupon, a break was had from 4:23 p.m. until 4:39

14  p.m.)

15      THE COURT:  All right.  Mr. Beane.

16      MR. BEANE:  Thank you, Your Honor.

17      Mr. Penders was kind enough to go and pull the docket

18  sheet.

19      The answer to the main question is that Mr. Bell was held

20  in District Court on the drug charge, not the weapons offense,

21  so, unless the Court factored in the drugs that were found in his

22  father's apartment, then I think that puts that issue to rest.

23      If the Court did factor in the drugs that were found in

24  this '96 case, then the authority under the Federal Sentencing

25  Guidelines would be Section 5G1.3, subsection B, which does

1    permit the Court to fashion a sentence that accounts for the time

2    that Mr. Bell would have been held on the relevant conduct that

3    the Court has determined to be applicable to this sentence.

4            THE COURT:  Thank you.  Mr. Leon.

5            MR. LEON:  We agree, Your Honor.

6            The fair reading of the sheet we've been given by

7    Mr. Penders indicates that Mr. Gregory Bell was held because of

8    the drugs, not because of the gun.

9            He was charged on the drugs, which actually makes sense

10   because there was 77 grams of crack and that is the type of

11   weight that's brought here in District Court.  He wasn't a felon

12   in possession.  It wasn't a gun case, it was a drug case.

13           THE COURT:  I think the language I will employ will be

14   generic rather than to cite a specific period of time because the

15   docket sheet seems to reflect there was some period of detention,

16   that there was some modification of the detention order, that the

17   defendant was released.  It's unclear from the docket sheet

18   whether he was released on his personal recognizance at that

19   point.  There was some point later in the docket sheet

20   reflecting, "released to the Department of Corrections to be

21   placed in a halfway house."

22           So, when the Bureau of Prisons does its calculations, I

23   guess it will be left to them to figure out exactly how much time

24   that is.  But I will go ahead, since it does appear that the

25   previous time that Mr. Bell appeared to have been detained in

1  1996 was in connection with narcotics seized in the August 2nd,

2  1996 search warrant, that was the subject of testimony here and

3  the findings about his having possessed with intent to distribute

4  crack or been responsible in part for it, and so I will order

5  that Mr. Bell be given credit for time served pre-trial in

6  Criminal Action Number 96-285 in this district.

7       Anything else we need to take up?

8       MR. BEANE:  No, sir.

9       THE COURT:  All right.  Anything else we need to take up?

10      MR. LEON:  No, sir.

11      THE COURT:  Thank you very much for coming in.

12      Mr. Bell, best of luck to you, sir.

13      (Proceedings adjourned at 4:43 p.m.)

14

**C E R T I F I C A T E**

15

16           I, Scott L. Wallace, RDR-CRR, certify that
    the foregoing is a correct transcript from the record of
17   proceedings in the above-entitled matter.

18

           _____
19         **Scott L. Wallace, RDR, CRR**
              **Official Court Reporter**
20

21

22

23

24

25